**FILED**

**June 2, 2015**

**TN COURT OF
WORKERS' COMPENSATION
CLAIMS**

**Time: 8:03 AM**



### COURT OF WORKERS' COMPENSATION CLAIMS
### DIVISION OF WORKERS' COMPENSATION

| | |
|---|---|
| **MICHAEL MARSH,**<br>　　　　**Employee,** | **Docket No.:　2015-06-0110** |
| **v.** | **State File No.: 70774-2014** |
| **MAYEKAWA USA,**<br>　　　　**Employer,** | **Date of Injury: September 2, 2014** |
| **And** | **Judge: Lisa A. Knott** |
| **BROADSPIRE,**<br>　　　　**Insurance Carrier.** | |

# INTERLOCUTORY ORDER

THIS CAUSE came before the undersigned Workers' Compensation Judge upon the Request for Expedited Hearing filed on April 23, 2015, by Michael Marsh (Mr. Marsh), pursuant to Tennessee Code Annotated section 50-6-239. Mr. Marsh requested that the Court issue a ruling based on review of the file without an evidentiary hearing. Upon review of Mr. Marsh's Request for Expedited Hearing, the evidence presented on review, and in consideration of the applicable law, the Court enters the following order holding that Mr. Marsh is not entitled to temporary disability benefits for his left shoulder.

### ANALYSIS

### Issue

*Whether Mr. Marsh is entitled to temporary disability benefits from January 23, 2015, through March 19, 2015.*

### Evidence Submitted

The Court has received and considered the following documents submitted by Mr. Marsh:

- Petition for Benefit Determination
- Tennessee Orthopaedic Work Status Note.

1

Mayekawa USA filed a response to the Request for Expedited Hearing. The Court has received and considered the following documents submitted by Employer:

- Affidavit of Kimberly Eilat
- Affidavit of Ashley Barrett
- Affidavit of Deborah Statom
- Affidavit of Jacqueline Piper-Lennon
- Mayekawa Benefit Election and Waiver
- Mayekawa List of Conduct
- Mayekawa Acknowledgement Form
- Tennessee Department of Labor, Division of Employment Security Agency Decision
- Medical Records of University Medical Center, Operative Report, date of service of December 17, 2014
- Dr. Roy Terry, Tennessee Orthopaedics, dates of service of January 22, 2015 and February 19, 2015
- *Carolyn Berry v. Armstrong Wood Product,* 2011WL 666138 (Tenn. Workers' Comp. Panel)
- First Report of Work Injury for date of injury of September 2, 2014
- Panel of Physicians, Form C-42 for date of injury of September 2, 2014
- 52 week Wage Statement, Form C-40, for date of injury of September 2, 2014
- Mayekawa USA's Calculation of Compensation
- Uncertified Medical Records, 169 pages
- Mayekawa USA's Positional Statement of March 25, 2015 with attached case law.

**History of Claim**

Mr. Marsh sustained a work-related shoulder injury on September 2, 2014. The authorized treating physician is Dr. Roy C. Terry. Mayekawa paid Mr. Marsh temporary total disability benefits from December 17, 2014, through January 22, 2015. Mayekawa terminated Mr. Marsh for misconduct, fraud, dishonesty, and falsifying records. On February 19, 2015, upon learning that Mr. Marsh was terminated and unable to find alternate employment, Dr. Terry noted that Mr. Marsh should be "completely out of work until such time as he is fully recovered from this injury." Mayekawa denied further temporary disability benefits since light duty work would have been available to Mr. Marsh but for his termination for cause. Mr. Marsh filed a PBD on March 9, 2015, seeking temporary disability benefits and a Request for Expedited Hearing (EH) on April 23, 2015. The EH request asked for a ruling based on review of the file without an evidentiary hearing. Dr. Terry placed Mr. Marsh at maximum medical improvement (MMI) on March 19, 2015.

2

## Mr. Marsh's Contentions

The only documentation provided from Mr. Marsh's attorney is a February 19, 2015 Work Status form. The "Work Status" form signed by Dr. Terry indicates that Mr. Marsh should be out of work from January 20, 2015, through March 19, 2015.

## Mayekawa USA's Contentions

Mayekawa's attorney filed a position statement with various affidavits and exhibits. The following excerpts were taken from that position statement:

### *Termination for Cause*

On or about May 5, 2014, Director of Human Resources, Kimberly Eilat, received a call from Don Smith. At that time, Mr. Smith was the manager of the Lebanon, Tennessee plant. Mr. Smith indicated that Mr. Marsh needed leave under the Family Medical Leave Act ("FMLA") because his twin babies had recently been born prematurely and he was concerned about his job. Ms. Eilat instructed Mr. Smith to tell Mr. Marsh not to worry about his job and to take care of his family. (Eilat Affidavit).

On or about May 6, 2014, Ms. Eilat traveled to the Lebanon, Tennessee plant. While there, she left FMLA paperwork for Mr. Marsh. Shortly thereafter, she spoke with him in person. He explained his twin babies had recently been born prematurely. Ms. Eilat told Mr. Marsh not to worry about his job and to take care of his family. On May 15, 2014, Mr. Marsh returned completed FMLA paperwork to Ms. Eilat. (Eliat Affidavit).

On or about May 27, 2014, Ashley Barrett was hired as Mayekawa's Human Resources Generalist for the Lebanon, Tennessee plant. Upon beginning work, she immediately began hearing rumors regarding Mr. Marsh. Specifically, it was rumored that he claimed he recently had twin babies when in fact only one baby had been born. Ms. Barrett did not take any action regarding these rumors beyond generally informing Ms. Eilat about the rumors. (Eilat Affidavit; Barrett Affidavit).

On May 30, 2014, Mr. Marsh submitted a signed Benefit Election & Waiver form which indicated he had two babies, Hunter Andrew Marsh and Christian Andrew Marsh, born on May 2, 2014. A copy of the signed Benefit Election & Waiver form was attached as Exhibit 1 to the respective affidavits of Ms. Eilat and Ms. Barrett.

Rumors continued to persist among plant employees that Mr. Marsh was lying about having twin babies. On August 28, 2014, multiple employees approached Ms. Barrett during her morning "walk through." They each generally stated that another employee, Arlen Antonsen, visited Mr. Marsh's home over the weekend. While there, he had seen nothing to indicate there was more than one baby in the home. For instance, there was only one stroller, crib, and high chair. (Barrett Affidavit).

3

Prompted by the continued rumors and statements made on August 28, 2014, Ms. Barrett reviewed Mr. Marsh's information on the BlueCross BlueShield ("BCBS") administration portal. In doing so, she discovered that the BCBS information listed a social security number for Hunter Andrew Marsh, but not for Christian Andrew Marsh. Ms. Barrett contacted Dominique Dean, Marketing Services Representative for BCBS, and informed her of the fact that no social security number was provided for Christian Andrew Marsh and there were persistent rumors that only one baby had been born in May 2014. Ms. Dean indicated she would look into the matter further. In the meantime, Ms. Barrett asked Mr. Marsh to provide a social security number for Christian Andrew Marsh. She explained this was a requirement of the insurance company. Mr. Marsh initially asserted that he previously provided the information. Ms. Barrett explained that she had a social security number for Hunter Andrew Marsh, but not for Christian Andrew Marsh. Mr. Marsh then stated he would have his wife bring the social security card to the plant later that day. However, his wife did not do so. In fact, Mr. Marsh never provided a social security number for Christian Andrew Marsh. (Barrett Affidavit).

Later that day, Ms. Eilat received a phone call from Kevin Carney, Account Executive for BCBS. Mr. Carney indicated BCBS's fraud department was investigating the matter, and explained there were twenty two (22) insurance claims made for Hunter Andrew Marsh but no claims for Christian Andrew Marsh. Ms. Eilat relayed this information to Ms. Barrett. Thereafter, Ms. Barrett again spoke with Ms. Dean of BCBS. She explained BCBS's investigation would take six (6) to eight (8) weeks to complete. After consulting with Ms. Eilat, Mr. Barrett determined no adverse actions would be taken against Mr. Marsh in the meantime. (Eilat Affidavit; Barrett Affidavit).

On October 22, 2014, Ms. Eilat received an email from Mr. Carney regarding the results of BCBS's investigation. This email indicated there was no evidence to support Mr. Marsh's claim that two (2) babies had been born and, in fact, BCBS's investigation indicated that only one baby was born. A copy of the email was attached as Exhibit 2 to the respective affidavits of Ms. Eilat and Ms. Barrett. In light of the foregoing, Mayekawa scheduled a meeting with Mr. Marsh. During the meeting, Ms. Eilat asked Mr. Marsh how many babies had been born to him in May 2014. He responded one baby had been born. Ms. Eilat confronted Mr. Marsh with the Benefit Election & Waiver form he signed on May 30, 2014 and asked why he had indicated on the form that he had two (2) babies if in fact he only had one. He responded one of the twin babies died at child birth. Ms. Eilat again asked why he would indicate he had more than one baby on the Benefit Election & Waiver form. Mr. Marsh responded one of the babies had absorbed the other. (Eilat Affidavit).

Ms. Eilat subsequently asked Mr. Carney whether there was any evidence one of Mr. Marsh's babies absorbed the other and he responded there was no evidence to that effect. A copy of Mr. Carney's email response was attached as Exhibit 3 to the respective affidavits of Ms. Eilat and Ms. Barrett.

Per Mayekawa's employee handbook, fraud, falsification of records, and other forms of dishonesty constitute improper conduct and justify termination. Attorney Burrow attached a copy of that page of Mayekawa's employee handbook as Exhibit 4 to the respective affidavits of Ms. Eilat and Ms. Barrett. Mr. Marsh was aware of this policy as evidenced by his acknowledgment

4

that he read the employee handbook. Attorney Burrow attached a copy of Mr. Marsh's acknowledgement as Exhibit 5 to the respective affidavits of Ms. Eilat and Ms. Barrett. Attorney Burrow averred that the evidence establishes Mr. Marsh violated known company policies against fraud, falsification of records, and general dishonesty. Mayekawa terminated him as a result. (Eilat Affidavit; Barrett Affidavit).

Following his termination, Mr. Marsh filed for unemployment benefits. In an Agency Decision dated November 19, 2014 (a copy was attached as Exhibit 6 to the respective affidavits of Ms. Eilat and Ms. Barrett), it was determined that Mayekawa terminated Mr. Marsh for his fraudulent actions and false statements, which constituted misconduct. Therefore, he was not entitled to unemployment benefits.

But for Mr. Marsh's termination for cause, Mayekawa would have continued to have light duty work available for him (Eilat Affidavit; Barrett Affidavit).

*Work Status*

Deborah Statom is a Field Case Manager for Broadspire, the third party administrator for Mayekawa's workers' compensation insurer. As part of this job, she attended Mr. Marsh's doctor appointments (Statom Affidavit).

Mr. Marsh's authorized treating provider in this matter is Dr. Roy C. Terry. Attorney Burrow noted there are rumors that Mr. Marsh and Dr. Terry are good friends and frequently socialize outside the context of a doctor-patient relationship (Barrett Affidavit). On December 17, 2014, Dr. Terry performed surgery to repair Mr. Marsh's left shoulder. Mr. Marsh improved following this surgery, and on January 22, 2015, Dr. Terry released him to light duty work with restrictions against using his left upper extremity. Attorney Burrow attached the January 22, 2015 work status report as Exhibit 2 to Ms. Statom's affidavit.

Mr. Marsh followed up with Dr. Terry on February 19, 2015. The medical record, attached as Exhibit 3 to Ms. Statom's affidavit, from that date provides in relevant part:

> He has had an unfortunate series of events. He saw us on January 20. He was post-op about 6 weeks at that point. When he left on January 22, there is a note stating that he could go back to light duty. However, light duty was not available to him through his employer who had terminated his employment. The gentleman, as a result of this release to light work and what he has reported to me today the employer cut off all financial support.... The gentleman has been unable to find any kind of employment with the restrictions he is currently under. He is in severe financial distress. I feel this gentleman at this point I feel because of his injury if there is no work available should be written completely out of work until such time as he is fully recovered from this injury. In looking out for the best interest of this gentleman from a doctor/patient relationship which I believe is my role in this case.

5

The gentleman, since there is no light duty available and he cannot find work, he would be best managed by no work allowed. I would also state that going back that the gentleman should have not been placed on light duty restrictions, since I was unaware of his employment status and his ensuing issues from a recovery status have been made more difficult.

During the February 19, 2015 appointment, Ms. Statom asked Dr. Terry for an assessment of Mr. Marsh's maximum physical capabilities for work. Dr. Terry responded his "check was cut off last month when the light duty work release was provided" and that was "not right." Ms. Statom explained Mayekawa would have continued to have light duty work available for Mr. Marsh but for his termination for issues not related to his injury. Dr. Terry responded Mr. Marsh was "losing things" and could not find another job, and stated he wanted to "do the right thing." Again, Ms. Statom asked Dr. Terry for an assessment of Mr. Marsh's current work capabilities and Dr. Terry again indicated he wanted to "do the right thing." He took Mr. Marsh out of work and stated he would not return him to work until he spoke with Mr. Marsh's attorney, Attorney Burrow, or the Division of Workers' Compensation. (Statom Affidavit).

Attorney Burrow averred it is apparent that the only reason Dr. Terry changed his medical restrictions was to help Mr. Marsh obtain temporary disability benefits. In fact, the proof demonstrates Mr. Marsh was progressing following his December 17, 2014 surgery. As such, Dr. Terry released him to light duty work on January 22, 2015. Dr. Terry took Mr. Marsh off work completely because of his financial situation, not as a result of a medical or physical complication. Mayekawa contends that, because there was no medical basis for changing the restrictions, Mr. Marsh has not established the total disability from working from January 23, 2015, through his placement at MMI on March 19, 2015, necessary to entitle him to an award of temporary total disability benefits.

### Findings of Fact and Conclusions of Law

*Standard Applied*

"The Workers' Compensation Law shall not be remedially or liberally construed in favor of either party but shall be construed fairly, impartially, and in accordance with basic principles of statutory construction favoring neither the employee nor employer." Tenn. Code Ann. 50-6-116 (2014). Tennessee Code Annotated section 50-6-239(c)(6) provides that "[u]nless the statute provides for a different standard of proof, at a hearing, the employee shall bear the burden of proving each and every element of the claim by a preponderance of the evidence." Tenn. Code Ann. section 50-6-239(c) (2014). A different standard of proof exists for the issuance of interlocutory orders at expedited hearings than the standard of proof required at compensation hearings. *McCord v. Advantage Human Resourcing,* No. 2014-06-0063 (Tenn. Work. Comp. App. Bd., March 27, 2015). A workers' compensation judge may enter an interlocutory order for medical or temporary benefits upon a determination that the injured employee would likely prevail at a hearing on the merits. Tenn. Code Ann. 50-6-239(d)(1) (2014); *cf McCall v. Nat'l Health Care Corp.,* 100 S.W.3d 209, 214 (Tenn. 2003).

6

*Factual Findings*

- On May 30, 2014, Mr. Marsh submitted a signed Benefit Election and Waiver form which indicated he had two (2) babies, Hunter Andrew Marsh and Christian Andrew Marsh, born on May 2, 2014 (Eilat and Barrett Affidavits).

- Mayekawa's employee handbook contained a statement that "theft, fraud, embezzlement, falsification of records, or other forms of dishonesty may result in disciplinary action, up to and including termination" (Exhibit to Eilat and Barrett Affidavits).

- Mr. Marsh signed an acknowledgement that he understood the information in Mayekawa's employee handbook (Exhibit to Eilat and Barrett Affidavits).

- But for Mr. Marsh's termination for cause, Mayekawa would have accommodated Mr. Marsh's restrictions of no use of his left upper extremity (Eilat and Barrett Affidavits).

- Dr. Terry released Mr. Marsh to light duty restricted work on January 22, 2015. On February 19, 2015, Dr. Terry took Mr. Marsh off work because he was terminated, unable to find work, and experiencing financial difficulty (Statom Affidavit with attached medical record).

*Application of Law to Facts*

The Tennessee Supreme Court has indicated that to present prima facia entitlement to temporary disability benefits the claimant has the responsibility to prove:

(1)   Total disability to work by a compensable injury;
(2)   That there was a causal connection between the injury and the inability to work; and
(3)   The duration of that period of disability.

*Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978).

In addition, temporary benefits stop when the employee becomes "able" to work at any employment permitted by the nature of the injuries. *Anderson v. Dean Truck Line, Inc.*, 682 S.W.2d 900, 903 (Tenn. 1984). Further, Tennessee appellate courts have taken the position that employees should not benefit from their unilateral bad acts. "An employee cannot avoid the statutory caps and thereby augment his award through his unilateral acts when those acts are unrelated to the injury." *Lay v. Scott County Sheriff's Department*, 109 S.W.3d 293, 299 (Tenn.

7

2003). The Tennessee Supreme Court in *Carter v. First Source Furniture Group*, 92 S.W.3d 367 (Tenn. 2002), found when an employer fires an employee for misconduct the employer does not open themselves up to exceeding the cap in T.C.A. § 50-6-241. *Id.* at 371, 372. Further, the *Carter* court held that when ascertaining whether the misconduct exception applies, the court is required to address whether the employer has satisfactorily demonstrated that the employee's misconduct was its actual motivation in terminating the employee. *Id.* Although the *Lay* and *Carter* cases apply to awards of permanent disability benefits, the principles stated therein are equally applicable to an award of temporary disability benefits.

The Court finds that Mayekawa has established that Mr. Marsh's misconduct of dishonesty and falsifying documents was the sole motivation for his termination. Mayekawa has further established that, but for the valid termination for cause, it would have accommodated Mr. Marsh's light duty restrictions. The only information or documentation provided by Mr. Marsh to support his claim for temporary total disability benefits is Dr. Terry's February 19, 2015 Work Status form that indicates Mr. Marsh should be out of work from January 20, 2015, through March 19, 2015. Dr. Terry stated the following in his February 19, 2015 office note:

> The gentleman has been unable to find any kind of employment with the restrictions he is currently under. He is in *severe financial distress...if there is no work available he should be written completely out of work* until such time as he is fully recovered from his injury...since there is no light duty available and he cannot find work, he would be best managed by no work allowed. I would also state that going back that *the gentleman should have not been placed on light duty restrictions, since I was unaware of his employment status*...(Emphasis added.)

It appears that Dr. Terry made his decision, to restrict Mr. Marsh from working, based on financial considerations rather than Mr. Marsh's physical condition as a result of the work injury.

The Court finds that Mr. Mash failed to establish that, from January 23, 2015, through March 19, 2015, he was totally disabled from working as a result of the work injury

**IT IS, THEREFORE, ORDERED** as follows:

1.  The claim of Michael Marsh against Mayekawa USA or its workers' compensation carrier, Broadspire, for the requested temporary total disability benefits is denied at this time on grounds other than compensability.

2.  This matter is set for Initial Hearing on July 10, 2015 at 9:00 a.m.CST/10:00 a.m. EST.

**ENTERED this the 2nd day of June 2015.**

_____
**HON. LISA A. KNOTT**

8

**Workers' Compensation Judge**

Initial Hearing:

An Initial Hearing has been set with Judge Lisa A. Knott, Court of Workers' Compensation Claims. You must call 865-594-0109 or toll free at 855-383-0003 to participate in the Initial Hearing.

Please Note: You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation. All conferences are set using Central Time (CT).

Right to Appeal:

Tennessee Law allows any party who disagrees with this Expedited Hearing Order to appeal the decision to the Workers' Compensation Appeals Board. To file a Notice of Appeal, you must:

1. Complete the enclosed form entitled: "Expedited Hearing Notice of Appeal".

2. File the completed form with the Court Clerk *within seven (7) business days* of the date the Expedited Hearing Order was entered by the Workers' Compensation Judge.

3. Serve a copy of the Expedited Hearing Notice of Appeal upon the opposing party.

4. The parties, having the responsibility of ensuring a complete record on appeal, may request from the Court Clerk the audio recording of the hearing for the purpose of having a transcript prepared by a licensed court reporter and filing it with the Court Clerk within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. Alternatively, the parties may file a statement of the evidence within ten (10) calendar days of the filing of the Expedited Hearing Notice of Appeal. The statement of the evidence must be approved by the Judge before the record is submitted to the Clerk of the Appeals Board.

5. If the appellant elects to file a position statement in support of the interlocutory appeal, the appealing party shall file such position statement with the Court Clerk within three (3) business days of the filing of the Expedited Hearing Notice of Appeal, specifying the issues presented for review and including any argument in support thereof. If the appellee elects to file a response in opposition to the interlocutory appeal, appellee shall do so within three (3) business days of the filing of the appellant's position statement.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 2nd day of June, 2015.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|----------------|---------|-----------|------------------|
| Mark Lambert | | | X | mlambert@forthepeople.com |
| D. Brett Burrow | | | X | bburrow@bkblaw.com |

PENNY SHRUM, COURT CLERK
wc.courtclerk@tn.gov

10